SLIP OPINION

# ARKANSAS COURT OF APPEALS

DIVISION I
**No.** CV-16-749

| | |
|---|---|
| JAMES HUBBARD<br><br>APPELLANT<br><br>V.<br><br>RICELAND FOODS, LIBERTY MUTUAL INSURANCE COMPANY, DEATH & PERMANENT TOTAL DISABILITY TRUST FUND<br><br>APPELLEES | **Opinion Delivered:** March 8, 2017<br><br>APPEAL FROM THE ARKANSAS WORKERS' COMPENSATION COMMISSION [NO. F501447]<br><br>AFFIRMED |

## BART F. VIRDEN, Judge

Appellant James Hubbard was working for appellee Riceland Foods on March 16, 2004, when he sustained compensable injuries to his right shoulder and neck.[1] In September 2015, an administrative law judge (ALJ) found that Hubbard was permanently and totally disabled. The Arkansas Workers' Compensation Commission (Commission) reversed that decision and determined that Hubbard had sustained 50 percent wage-loss disability. Hubbard argues on appeal that the Commission's decision is not supported by substantial evidence and that the Commission erred as a matter of law by requiring him to have a physician's opinion that he was permanently and totally disabled in order to sustain his burden of proof. We affirm.

---

[1]In November 2008, an ALJ found that Hubbard had also proved that he sustained a compensable neck injury and that surgery was reasonable and necessary. The Commission affirmed and adopted the ALJ's decision.

SLIP OPINION

I.    *Hearing*

A.  Hubbard's Testimony

At a hearing in July 2015, Hubbard testified that he was seventy-three years old, that he had finished the sixth grade in school and did not read or write well, and that he had worked "odd jobs" after leaving school. He stated that he had picked and chopped cotton, cut wood, dug holes for septic tanks, and mowed lawns. He later threw logs at a sawmill and stacked lumber. He went to work for Riceland in the early 1960s. He was laid off from Riceland for a couple of years during which time he worked at a paper mill. Hubbard then returned to Riceland. He testified that he had worked there for nearly forty years. He said that he began working in the packaging department; he was later moved to shipping and receiving; and then he was moved to the scale floor where he had started moving pipes. He said that his job was to physically move big round pipes that "looked like [they] weighed about 3,000 or 4,000 pounds." He said that the rice would go through the pipes and that he directed it for loading into a truck, a railcar, or a bin. Hubbard said he worked sixty-five to eighty hours per week. He said that in 1997 he injured his left foot and ankle when he had strained to pull a pipe, that he still has problems with the foot, and that he wears special boots to protect his ankle.

According to Hubbard, on March 16, 2004, he overstrained while pulling a pipe and felt "a shocking pain" down his right arm from his neck and shoulder. He reported the injury and worked with assistance until June 29, 2004, when he turned sixty-two years old, retired, and began drawing Social Security benefits and pension payments. Hubbard said

that he would still be working at Riceland today but could no longer work there because of his injuries. He said, "I don't know of any job I've held in my lifetime that I would be physically able to do right now."

Hubbard testified that he had surgeries on his neck, elbow, and wrist and fingers. He agreed that at a deposition in March 2008 he testified that the surgeries had improved the use of his hand and that his neck had gotten better. He agreed that, according to his deposition, he had said that he had no problems other than his neck was "a little stiff." Hubbard testified that he had a ten-pound lifting restriction after his neck surgery.

Hubbard said that he had had diabetes for thirty years, high blood pressure, and some cholesterol issues. He also had cataract surgery not long ago. Hubbard was wearing a neck brace at the hearing and stated that he wore it off and on during the day and that he had to be careful how he turned his neck. He stated that he could drive a vehicle but that he had to turn his entire upper body to look out the window. He displayed his right hand—a fist that he had difficulty opening completely. Hubbard stated that he had received therapy for his hand and had chosen on his own to wear a hand brace. He denied having had problems with his right hand since he was a young boy and did not know why his therapist would have written that in his records. He also denied having had any other injuries since 2004 but was confronted with records from Jefferson Comprehensive Care System, Inc., showing that he had been involved in a motor-vehicle accident in April 2009, that he had complained of neck and back pain, and that he had follow-up visits from April through August "just [to] mak[e] sure there wasn't nothing wrong with [him]."

In describing an average day, Hubbard said that he got up early to take his medications, that he watched television in the morning, and that friends sometimes came by to check on him, feed his dogs, or help him with his lawn. He said that his niece lives with him and that she does the cooking and cleaning. Hubbard agreed that he did not wear a neck brace to his deposition in March 2008 and that he had testified that he was mowing his own yard, cooking and cleaning, driving, and living by himself.

Hubbard testified that he had not looked for work in any capacity since he left Riceland and had not returned to Riceland to see whether the company had work for him.

B. Medical Records

On March 16, 2004, Hubbard sought treatment at Stuttgart Regional Clinic and was assessed with right-shoulder strain. He was released the same day to restricted-duty work. Hubbard began experiencing problems with his right arm and hand in late March 2004 and followed up with several doctors at the clinic. At a follow-up visit in April 2004, Hubbard was restricted to left-hand work only. In May 2004, Hubbard was pulling a lever to release rice with his left hand and pulled his left shoulder. An EMG/nerve-conduction study in May 2004 was abnormal, and it was recommended that he have a full neurological consultation and testing.

A nerve-conduction study in April 2007 was also abnormal. It was noted that Hubbard complained of right-arm weakness that had progressed to his left arm. Hubbard saw Dr. Reza Shahim at Neurological Surgery Associates in August 2007. On August 31, 2007, Dr. Shahim performed "1. Cervical laminectomy extending from C4 through C7 with decompression C3, 4, 5, 6, and 7. 2. Bilateral foraminotomies. 3. Lateral mass plating

at C3-4 with posterior inner facet fusion at C3-4." In January 2008, Dr. Shahim reported that Hubbard was getting better and released him.

In November 2008, Dr. Shahim reported that "[Hubbard] could undergo decompression of a median nerve and ulnar nerve, but I'm not sure if that is going to help him with his hand function at this point. . . . His neck and shoulder symptoms are stable." In January 2009, Dr. David Rhodes performed "1. Right volar wrist flexor tendon tenosynovectomy with median nerve decompression of the wrist. 2. Right ulnar nerve decompression at the elbow. 3. Adjacent tissue transfer of the flexor carpi ulnaris to fill a soft tissue defect measuring 4 cm2."

In September 2009, Dr. Shahim reported that Hubbard complained of right-hand weakness, had right-hand claw deformity, and continued to have neck and shoulder symptoms. In January 2010, Hubbard saw Dr. Rhodes, who noted that "he has improvement, however, the right long finger is continuing to be flexed." In February 2010, Hubbard underwent surgery—a right-hand flexure contracture release. In June 2010, Dr. Rhodes noted that Hubbard had said that he was "much improved from his surgeries," and Dr. Rhodes released him. The parties agreed that Hubbard reached maximum medical improvement (MMI) on June 9, 2010.

In February 2012, Hubbard saw Dr. Shahim, who reported that

[Hubbard] is doing fairly well. He does complain of some aches and pains in the posterior cervical spine. He says his symptoms have been very stable. He denies any new pain or any change in any pain pattern. He has had right arm weakness and right hand deformity, which has also been stable.

Dr. Rhodes saw Hubbard in March 2012 and noted that Hubbard had reported improvement after his hand surgery. Dr. Shahim reported in October 2012 that

The patient has neck and shoulder pain. He has received prior cervical decompression. He has had significant improvement in his symptoms. He says his neck and shoulder symptoms are not very severe at this point. He has right hand deformity that is stable. He says after ulnar decompression and release in his hand, that his hand has improved. He says his neck and shoulder symptoms are mild and the headaches are very mild and not very severe at this point.

On June 4, 2014, Dr. Shahim assigned a 13 percent permanent impairment to the body as a whole.

## II.    *Permanent & Total Disability and Wage Loss*

"Permanent total disability" means inability, because of compensable injury or occupational disease, to earn any meaningful wages in the same or other employment. Ark. Code Ann. § 11-9-519(e)(1) (Supp. 2015). The burden of proof shall be on the employee to prove inability to earn any meaningful wage in the same or other employment. Ark. Code Ann. § 11-9-519(e)(2).

When a claimant has been assigned an anatomical impairment rating to the body as a whole, the Commission has the authority to increase the disability rating, and it can find a claimant totally and permanently disabled based on wage-loss factors. *Milton v. K-Tops Plastic Mfg. Co.*, 2012 Ark. App. 175, 392 S.W.3d 364. The wage-loss factor is the extent to which a compensable injury has affected the claimant's ability to earn a livelihood. *Id*. The Commission is charged with the duty of determining disability based on a consideration of medical evidence and other matters affecting wage loss, such as the claimant's age, education, and work experience. *Id*. In considering factors that may affect an employee's future earning capacity, the court considers the claimant's motivation to return to work, since a lack of interest or a negative attitude impedes our assessment of the claimant's loss of earning capacity. *Id*.

SLIP OPINION

### III.  *Commission's Decision*

While the ALJ determined that Hubbard had sustained his burden of proving that he was permanently and totally disabled, the Commission reversed, finding that

> the claimant did not prove by a preponderance of the evidence that he is permanently and totally disabled. No treating physician has opined that the claimant is "unable to earn any meaningful wage in the same or other employment," which element the claimant is required to prove in accordance with Ark. Code Ann. § 11-9-519(e) (Repl. 2012). Both treating surgeons have opined that the surgeries the claimant has undergone have decreased the claimant's symptoms and increased his physical capabilities. Nevertheless, the claimant has not sought any appropriate gainful employment since retiring from Riceland in 2004. The claimant's demonstrated lack of interest in returning to work is an impediment to the Commission's full assessment of the claimant's alleged permanent total disability. When considering the claimant's relatively advanced age, lack of education, history of unskilled manual labor, permanent physical restrictions, and lack of interest in returning to gainful employment, the Full Commission finds that the claimant proved he sustained wage-loss disability in the amount of 50%.

(Internal citations omitted.)

### IV.  *Standard of Review*

In reviewing decisions from the Commission, we view the evidence and all reasonable inferences deducible therefrom in the light most favorable to the Commission's findings, and we affirm if the decision is supported by substantial evidence. *White v. Ark. State Highway & Transp. Dep't*, 2009 Ark. App. 768. Substantial evidence exists if reasonable minds could reach the same conclusion. *Id.* The determination of the credibility and weight to be given a witness's testimony is within the sole province of the Commission; the Commission is not required to believe the testimony of any witness but may accept and translate into findings of fact only those portions of the testimony it deems worthy of belief. *Voan v. City of Texarkana*, 2015 Ark. App. 625. The issue is not whether the appellate court



might have reached a different result from the Commission; if reasonable minds could reach the result found by the Commission, the appellate court must affirm. *Milton v. K-Tops Plastic Mfg. Co.*, 2012 Ark. App. 175, 392 S.W.3d 364.

## V.    *Discussion*

Hubbard argues that the Commission erred as a matter of law in requiring an injured worker to produce a physician's opinion that he is permanently and totally disabled. He also argues that it is "utterly non-sensical" to find that he did not seek other employment due to a lack of interest after the Commission found that he was credible in stating that he had retired due to difficulties he experienced as a result of his work injury. Hubbard argues that because of these errors, the Commission erred in finding that he was entitled to only 50 percent wage-loss disability.

The Commission found that Hubbard had retired from Riceland because of his work-related injuries and the associated difficulties with that particular job but that Hubbard had improved following his surgeries. He could have, but did not, seek other work that he was capable of performing. We note that the statute says "the same *or other employment*." The Commission apparently did not believe Hubbard's testimony that he "can't do anything." Hubbard had a ten-pound lifting restriction and had reached MMI in June 2014. We hold that the Commission's decision displays a substantial basis for denying Hubbard's claim that he was permanently and totally disabled.

Further, we hold that there is substantial evidence to support the Commission's decision that Hubbard sustained 50 percent wage-loss disability. The Commission pointed out that Hubbard is now seventy-three years old, that he has only a sixth-grade education,

and that his work history involves primarily unskilled manual labor. The Commission considered the appropriate factors, including the medical evidence and Hubbard's motivation to return to work within his restrictions.

The Commission required Hubbard to prove that he was "unable to earn any meaningful wage," which is an element of proving permanent and total disability. The Commission did not require a physician's opinion in order to sustain his burden of proof. The Commission was simply pointing out that Hubbard had no physician's opinion that he was permanently and totally disabled and that, in fact, his surgeons reported that Hubbard had improved after his surgeries. Having a physician's opinion is just one way to demonstrate permanent and total disability.

Affirmed.

ABRAMSON and GLADWIN, JJ., agree.

*Gary Davis*, for appellant.

*Friday, Eldredge & Clark, LLP*, by: *Guy Alton Wade* and *Phillip M. Brick, Jr.*, for appellees.